IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANNETTE T. SINEGAR, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:12-CV-2971 |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

    This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Annette T. Sinegar's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

    For the reasons set forth below, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

## I. PROCEDURAL HISTORY & PERSONAL BACKGROUND

    Plaintiff Annette Sinegar ("Plaintiff" or "Sinegar") filed applications for Supplemental Security Income benefits and Disability Insurance benefits on March 25, 2009. (Tr. 15, 144-45, 151-53). Sinegar alleged she became disabled on February 16, 2009. (Tr. 207-22, 244). The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 92-98, 102-07).

1

At Sinegar's request, administrative law judge ("ALJ") Kyle C. Alexander convened an administrative hearing on July 3, 2012 to evaluate her applications. (Tr. 32-87). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Gene Burkhammer, also appeared and testified. (*Id.*). On May 23, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 15-27). After applying the five-step sequential analysis,[1] the ALJ determined Sinegar retained the ability to perform work existing in significant numbers in the national economy. (*Id*.). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 10). The Appeals Council denied the request for review, making the ALJ's May 23, 2011 determination the final decision of the

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Commissioner. (Tr. 1-5). Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Sinegar was born on January 1, 1958, and was 53-years-old on the date the ALJ rendered his decision. (Tr. 109). Accordingly, she was considered as a "person closely approaching advanced age" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). Plaintiff had previous work experience as a convenience store cashier, grocery store deli clerk, grocery store manager, department store clerk, salad bar attendant, and prep cook. (Tr. 65).

## II. MEDICAL EVIDENCE[2]

In February 2009, Plaintiff presented to the Nord Center for mental health treatment after recently losing her job and battling feelings of anxiety, depression, and hopeless. (Tr. 436-39). Robert Beadle, a licensed social worker, performed a mental status examination that showed Plaintiff was depressed and tearful at times, but otherwise cooperative, with an intact thought process and normal speech. (Tr. 437). Beadle diagnosed alcohol induced mood disorder and alcohol abuse, and assigned a Global Assessment of Functioning ("GAF") score of 50, which represents serious symptoms. (Tr. 439).[3]

During April 2009, Plaintiff reported to the emergency room due to feelings of depression. (Tr. 279-82). Earlier that day, Plaintiff had called the Nord Center crisis line reporting suicidal ideation, but she denied suicidal and homicidal ideation at the hospital and

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal. It is not intended to reflect all of the medical evidence of record. Plaintiff challenged only the ALJ's evaluation of her mental impairments, therefore, the Court's discussion is limited to that portion of the medical record.

[3] "GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates '[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.' At the high end, GAF 91-100 indicates '[s]uperior functioning in a wide range of activities.'" *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (internal citations omitted).

3

admitted to recently drinking alcohol. (Tr. 281-82). Plaintiff was diagnosed with bipolar disorder and alcohol induced mood disorder. (Tr. 283). Soon after her discharge from the hospital, Plaintiff reported to the Nord Center where she presented as depressed and anxious, but well-oriented with good speech. She was assigned a GAF score of 55, indicating moderate symptoms. (Tr. 443-46).

In May 2009, clinicians from the Nord Center went to Plaintiff's home after she called the crises line numerous times. (Tr. 424-27). Clinicians found Plaintiff intoxicated and partly unconscious. Plaintiff denied suicidal ideation and was told she could be charged for calling the suicide hotline. (Tr. 481). When Sinegar reported to the Nord Center later that day she was assigned a GAF score of 59, indicating moderate symptoms. (Tr. 422-23). On July 11, 2009, Plaintiff reported plans to overdose to the Nord Center crisis line and was brought to the emergency room by ambulance. (Tr. 467-71). She was discharged with diagnoses of depression, suicidal ideation, and alcohol intoxication. (Tr. 470).

On July 20, 2009, clinical psychologist Ronald Smith, Ph.D., performed a consultative examination of Sinegar. (Tr. 302-08). Plaintiff complained that she experienced greater depression from November to March, and that in recent days, she had been slightly more depressed because of returning memories of childhood abuse. (Tr. 305-06). Plaintiff also indicated that she lost her latest job because of absenteeism. (Tr. 303). Sinegar expressed feeling anxiety when she does not want to drive and spells of short breath. (Tr. 305). However, she generally gets eight to ten hours of sleep, and her medication was helpful for anxiety. (Tr. 306).

During the examination Sinegar was cooperative, but somewhat indirect and imprecise in her responses. (Tr. 305). Dr. Smith wrote that Plaintiff showed appropriate expression with a good range of affect. (*Id.*). Plaintiff's insight and judgment were good. (Tr. 308). Her daily

4

activities consisted of reading the newspaper, running errands with her boyfriend, working in her garden, cleaning her home, and going to a casino. (*Id.*).

Dr. Smith diagnosed major depressive disorder, with seasonal pattern, and assigned a GAF score of 50. (Tr. 306). Dr. Smith opined that Sinegar would not be impaired in her ability to relate to others or to understand, remember, and follow instructions. (Tr. 307). He indicated that "at the present time," Sinegar is moderately limited in her ability to maintain attention, concentration, and persistence in the performance of routine tasks, due to thoughts of prior abuse and symptoms of depression. (*Id.*). Additionally, Dr. Smith found that there will be seasonal fluctuations in Sinegar's work attendance and ability to focus on the job, with her performance suffering more during the winter. (*Id.*). Dr. Smith concluded that Sinegar's mental ability to handle the stress and pressure of daily work is moderately impaired. (*Id.*).

In August 2009, state agency consultant Vicky Warren, Ph.D., conduct a review of the record evidence related to Sinegar's mental health. (Tr. 309-11). The consultant concluded that Plaintiff was "capable of work which does not require great attention to detail, and which does not require that she adapt to changing job duties or deal with rapid work pace." (Tr. 311). In December 2009, after conducting an independent review of the record, Karla Voyten, Ph.D., recommended the same limitations. (Tr. 356).

At a March 2010 medication review with psychologist, Margaret Messerly, M.D., Sinegar was depressed and stated she had not used alcohol since August 2009. (Tr. 397). However, Dr. Messerly found that Plaintiff smelled like alcohol. (*Id.*). On June 7, 2010, Dr. Messerly adjusted Plaintiff's medications after Plaintiff indicated continued struggles with depression and motivation. (Tr. 388). On June 30, 2010, a provider at the Nord Center found Sinegar was less dysthymic, more positive, well-oriented, and reported feeling much better with

5

new medication. (Tr. 386). During July 2010, Dr. Messerly wrote that Sinegar was finding her medication helpful and displayed no signs of racing thoughts, increased anxiety, or mania. Sinegar was calm, peaceful, enthusiastic about her garden, and staying more active. (Tr. 378-79).

In September 2010, Dr. Messerly observed that Sinegar had an appropriate affect, was cooperative, and had made good progress. (Tr. 367-69). Dr. Messerly also described Plaintiff as happy, bright, positive, and optimistic. (Tr. 368). Sinegar indicated her medication was helping, her mood was stable, she was less anxious, and she had better energy. (*Id.*). During December 2010, Plaintiff reported feeling more depressed and irritable around the holidays, but she also admitted to being out of her routine and was working to get back on track. (Tr. 510). During January 2011, Plaintiff reported some depression, but presented as alert, oriented, and cooperative. (Tr. 506). In March 2011, Plaintiff stated she continued to experience depression, but was pleased that she had not been hospitalized for some time. (Tr. 504). She was also helping to care for her boyfriend after he underwent a medical procedure. (*Id.*).

On April 5, 2011, Dr. Messerly completed a medical source statement evaluating Singer's mental impairments. (Tr. 516-19). Dr. Messerly found that Plaintiff was "markedly" limited in her ability to (1) maintain attention and concentration for extended periods, (2) accept instructions and respond appropriately to criticism, and (3) set realistic goals or make plans independently. The psychologist opined that Sinegar was "moderately" limited in her ability to (1) carry out detailed instructions, (2) perform activities in a schedule, (3) maintain attendance and be punctual, (4) sustain an ordinary routine without special supervision, (5) work in coordination with other without being distracted, (6) complete a normal workday and week without interruptions from symptoms, (7) interact appropriately with the public, and (8) get along with co-workers. Overall, the doctor found Sinegar had a "substantial loss" of her ability

6

to make judgments related to unskilled work, respond appropriately to supervision and co-workers, and deal with change in a routine work setting.

### III.  SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since February 16, 2009, the alleged onset date.

3. The claimant has the following severe impairments: major depressive disorder/bipolar disorder, post-traumatic stress disorder/anxiety, chronic alcohol abuse (reportedly in remission), bilateral degenerative joint disease of the knees, and degenerative disc disease of the lumbar spine.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with the ability to lift up to twenty pounds occasionally and ten pounds frequently, to stand/walk for about a total of six hours, to sit for at least a total of six hours, and to perform unlimited pushing/pulling within the weight limits above.  However, the claimant should only occasionally climb ramps/stairs, stoop, kneel, crouch, or crawl, and she should never climb ladders, ropes, or scaffolds.  Additionally, she would perform no more than occasional overhead reaching with the right upper extremity.  The claimant also retains the ability to perform work not requiring great attention to detail, but she is able to tolerate few, if any, changes in the workplace.  She is also unable to adhere to strict, high production standards or rapid production rate.

6. The claimant is capable of performing past relevant work as a cashier, a grocery/delicatessen worker, and a salad bar attendant.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 16, 2009, through the date of this decision.

(Tr. 17-26) (internal citations omitted).

### IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

### V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it

may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS
### A. Plaintiff's Treating Source

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2). The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544. When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6). The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

Sinegar alleges that the ALJ violated the treating source rule by failing to apply the controlling-weight analysis to the opinions of her treating psychologist, Dr. Messerly. In April 2011, Dr. Messerly completed a medical source statement evaluating Singer's mental

9

impairments. (Tr. 516-19). Dr. Messerly found that Plaintiff had eight moderate and three marked mental limitations. (Tr. 517-18). The psychologist also opined that Sinegar had a substantial loss of the abilities to make simple work-related decisions; respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting. (Tr. 518). The parties do not dispute that Dr. Messerly qualified as a "treating source."

Contrary to Plaintiff's allegations, the ALJ adequately followed the mandates of the treating source rule and provided a well-supported explanation for attributing "little weight" to Dr. Messerly's opinion. (Tr. 23-24). The ALJ found that Dr. Messerly's findings were inconsistent with the weight of medical evidence, and as a result, should not be accorded controlling weight. (Tr. 24). The ALJ then provided good reasons for the weight he attributed.

In support of his decision, the ALJ noted that Dr. Messerly's treating source statement was "quite conclusory," and within it, Dr. Messerly provided no explanation of the evidence she relied on in forming her opinion. (Tr. 24). Generally, when evaluating a claimant's alleged disability, "[t]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). The medical source statement form at issue here lists work-related skills and corresponding check boxes related to the severity of any limitation. The end of the form provides space for the physiatrist to make clarifying comments. On the medical source statement, Dr. Messerly did not include additional notes, or reference treatment notes, that would support her finding of significant limitations. The ALJ reasonably questioned the extreme limitations on the form, because Dr. Messerly provided no explanation for their basis. Moreover, the ALJ went on to give additional reasons for giving less than controlling weight to Dr. Messerly's findings.

Plaintiff argues that Dr. Messerly's opinions were supported by the psychologist's own treatment notes and treatments notes of other Nord Center professionals.  Plaintiff cites to a number of treatment records arising out of her mental health care at the Nord Center; however, these records do not sufficiently bolster the extreme limitations Dr. Messerly imposed.  Contrary to Plaintiff's argument, the evidence she refers to shows that when Plaintiff took the appropriate medication and abstained from alcohol, her symptoms improved, which undermines the import of Dr. Messerly's serious limitations.  Following a period of abstinence after a March 2010 medication review and some adjustment of her medication in June 2010, Plaintiff's records show a significant improvement in her mood. (Tr. 397, 388)  During treatment, Sinegar was positive and calm. (*See, e.g.*, Tr. 386, 378-79, 367-69).  While Plaintiff was feeling more depressed in January 2011, she had run out of a medication. (Tr. 508).   In March 2011, not long before Dr. Messerly completed her medical source statement, Sinegar reported some depression, but she was pleased that she had not been hospitalized for quite some time and was motivated to care for her boyfriend after a medical procedure. (Tr. 504).

Accordingly, the undersigned agrees with the ALJ's finding that Plaintiff displayed improvement with medication and abstinence, and that this progress was a good reason to attribute little weight to Dr. Messerly's opinions.  As the ALJ observed, in June 2010, Plaintiff was less dysthymic, more positive, and feeling better with new medication. (Tr. 21, 286).  In September 2010, Sinegar was happy, with a stable mood, less anxiety, and better energy. (Tr. 21, 368).  Though treatment notes from Dr. Messerly and the Nord Center indicate that Plaintiff was limited to some degree by her mental illness, they do not reflect the extent of the limitations that Dr. Messerly proposed.  Based on a review of the ALJ's opinion and the record, substantial evidence supports the ALJ's treating source analysis.

Sinegar contends that even if the ALJ reasonably determined that Dr. Messery's opinion was not entitled to controlling weight, the ALJ erred by failing to address the factors denoted in 20 C.F.R. § 416.927(d)(2) in explaining the weight he attributed.  But Sinegar has not identified any case law demanding an ALJ to specify how he analyzed each of these factors individually.  The regulations only require the ALJ to provide " 'good reasons . . . for the weight . . . given to the treating source's opinion'–not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (alterations in original).  The "good reasons" requirement only demands the ALJ to *consider* the factors provided in 20 C.F.R. § 416.927.  *Blanchard v. Comm'r of Soc. Sec.*, No. 11-CV-12595, 2012 WL 1453970, at *16-17 (E.D. Mich. Mar. 16, 2012), *R&R adopted* 2012 WL 1432589.  While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, so long as the ALJ's opinion clearly conveys why the doctor's opinion was credited or rejected, the ALJ has satisfied his burden.  *Francis*, 414 F. App'x at 804.  Moreover, contrary to Plaintiff's contention, the ALJ acknowledged that Dr. Messerly was indeed a "treating psychiatrist," denoting both Dr. Messerly's treating relationship and expertise.  The ALJ also took into account the supportability and consistency of Dr. Messerly's opinion, two additional factors set forth by the regulations.  See 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

Finally, Plaintiff alleges that the ALJ failed to comply with Social Security Ruling 96-5p in evaluating Dr. Messerly's medical source statement.  Quoting S.S.R. 96-5p, Plaintiff explains: "Adjudicators must remember . . . that medical source statements [submitted by treating sources or consultative examiners] may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it *may* be necessary to decide whether to adopt or not adopt each one."  S.S.R. 96-5p,

12

1996 WL 374183, at *4 (July 2, 1996). (emphasis added).  Contrary to Plaintiff's argument, the text of the ruling is discretionary regarding the ALJ's discussion of the opinions set forth in medical source statements.  The ALJ sufficiently explained why he assigned little weight to the findings in Dr. Messerly's treating source statement, and therefore, adequately fulfilled his obligation.

### B.  Plaintiff's Consultative Examiner

Sinegar maintains that the ALJ erred in analyzing consultative examiner Dr. Smith's opinions.  Following a psychological examination of Sinegar in August 2009, Dr. Smith provided a discussion of Sinegar's work-related mental abilities.  Relevant to the issue here is Dr. Smith's statement that

> [Sinegar's] mental ability to maintain attention, concentration, and persistence in the performance of routine tasks will be moderately impaired at the present time due to preoccupations with early abuse and some continued depressive symptomatology.  There will be seasonal fluctuations in her work attendance and ability to focus on the job with her performance suffering more during the wintertime.

(Tr. 307).  The ALJ addressed Dr. Smith's opinion when formulating the RFC by explaining,

> Dr. Smith opined the claimant has no more than moderate impairments in her work-related mental abilities.  This opinion is consistent with the findings of the consultative examination and with progress notes of mental health providers.  Accordingly, this opinion has been given substantial weight in determining the claimant's residual functional capacity.

(Tr. 23) (internal citations omitted).  Plaintiff argues that the ALJ's residual functional capacity assessment ("RFC") does not account for Dr. Smith's limitations of a reduced ability to maintain work attendance, perform routine tasks, or focus.  According to Plaintiff, the ALJ implicitly rejected these limitations by failing to accommodate for them in the RFC, and because the ALJ failed to explain his reason for rejecting such limitations, remand is necessary.

13

It is well established that for a decision to stand, an ALJ is not required to discuss every piece of evidence in the record. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). However, Social Security Ruling 96-8p states: "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96-8p, 1996 WL 374184, at *7; *see, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011).

There is merit to Sinegar's argument that the ALJ implicitly rejected Dr. Smith's opinion regarding her ability to maintain attendance and failed to explain why he did so. The RFC conflicts with Dr. Smith's opinion in that it fails to accommodate any limitation regarding attendance, yet the ALJ did not provide a rationale for rejecting Dr. Smith's recommendation. Additionally, the ALJ assigned "significant weight" to the entirely of Dr. Smith's opinion. (Tr. 23). To rationalize this distribution of weight, the ALJ stated that Dr. Smith's opinion was consistent with the results of the psychologist's consultative examination and progress notes from other mental health providers. (*Id.*). Given that the ALJ attributed significant weight to Dr. Smith, and he did so because the psychologist's findings were purportedly well-supported and consistent with the record, it is not clear why the ALJ apparently discredited Dr. Smith's opinion regarding Sinegar's fluctuations in attendance. Without some explanation from the ALJ, the undersigned cannot determine if the ALJ intended to reject any attendance restriction, or intended to credit the finding, but failed to include an RFC restriction.

Furthermore, this court has recognized that "[i]f an RFC is an assessment . . . of what a claimant can do despite his or her impairment (SSR 95-5P), then it must consider whether the claimant is able to attend work." *Harmon v. Astrue*, 5:09-CV-2765, 2011 WL 834138 (N.D.

14

Ohio Feb. 8, 2011) *report and recommendation adopted*, 5:09-CV-2765, 2011 WL 825710 at *4 n.1 (N.D. Ohio Mar. 4, 2011); *see also Dent v. Astrue*, No. 07-2238-MaP, 2008 WL 822078 at *18 (W.D. Tenn. Mar. 26, 2008)*, ("The court submits that on remand, in connection with the ALJ's evaluation of Dr. Cannon's opinions and RFC assessment, the ALJ should address Dr. Cannon's opinion regarding Dent's frequent absenteeism and the impact it has on her ability to work, which may require taking testimony from a vocational expert."). Because it is unclear whether the ALJ credited or rejected Dr. Smith's opinion regarding attendance issues, remand is necessary for the ALJ to clarify his analysis of the psychologist's opinion and explain a decision to reject an attendance limitation. Alternatively, if a limitation regarding absenteeism is adopted, the ALJ should obtain the testimony of a VE to determine the impact on the finding at step five of the sequential analysis.

The Commissioner's attempt to justify the ALJ's actions is unavailing. The Commissioner points out that two state agency psychologists opined Plaintiff retained the ability to perform work, despite her mental limitations. While the state agency physicians reviewed Dr. Smith's opinion, their reviews do not explain why they, too, did not acknowledge Dr. Smith's finding of attendance fluctuations. As a result, their opinions do not shed light on why the ALJ discredited this portion of Dr. Smith's report.

Sinegar also argues that the ALJ failed to accommodate Dr. Smith's finding of a moderate impairment in her ability to perform routine tasks, as well as seasonal fluctuations in her ability to focus. However, Dr. Smith did not find that Plaintiff was moderately impaired in all aspects of performing routine tasks. Dr. Smith found that Sinegar was moderately impaired in her ability to maintain attention, concentration, and persistence when performing routine tasks. (Tr. 307). At least some courts may hold that the ALJ accommodated for Plaintiff's limitations

15

in maintaining focus, attention, concentration, and persistence by limiting Sinegar to work that does not require strict or high production standards, or a rapid production pace. (Tr. 20). *See, e.g.*, *Schooley v. Astrue,* No. 09-CV-2748, 2010 WL 5283293, at *2 (N.D. Ohio Dec. 17, 2010) (hypothetical limiting the plaintiff to no "high production quotas or piece work" consistent with a moderate limitation in concentration, persistence, or pace). Plaintiff cites to no authority indicating that the RFC fails to accommodate these limitations. Nonetheless, given that remand is necessary to clarify another aspect of Dr. Smith's evaluation, the ALJ may wish to more clearly articulate his opinion regarding these limitations.

### C. State agency reviewing consultants

Sinegar also takes issue with the ALJ's analysis of state agency reviewing consultants Drs. Warren and Voyten. The consultants found Plaintiff was capable of work "which does not require that she adapt to changing job duties." (Tr. 311, 356). According to Sinegar, the ALJ's explanation for partially rejecting this limitation was inadequate.

The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). Plaintiff cites to *Alexander v. Comm'r of Soc. Sec. Admin.*, 3:11-CV-1254, 2012 WL 1658707, at *5 (N.D. Ohio May 11, 2012), where the court remanded the case for further proceedings because when formulating the RFC, the ALJ did not consider the state agency physicians' opinions that the claimant was moderately limited in concentration and attention. More importantly, the court found that the ALJ provided no explanation as to why those opinions were rejected, other than to find that the claimant lacked credibility. *Id.*

16

Here, unlike in *Alexander*, the ALJ complied with the regulations by providing an analysis that was sufficient to explain why he partially rejected the state agency consultants' opinions. In doing so, the ALJ complied with the regulations. The ALJ acknowledged that the consultants recommended jobs which do not require adaption to changing job duties. (Tr. 23). However, the ALJ went on to explain that,

> [w]hile these opinions are generally consistent with the weight of the evidence, the record does not indicate the claimant is completely unable to adapt to any and all changes in the work setting. Therefore, the undersigned has accommodated the claimant's alleged adaptation problems by finding she is able to tolerate few, if any, changes in the workplace.

(*Id.*) The ALJ's explanation directly addresses the limitation at issue. Plaintiff does not point to case law that would require a more involved analysis. The record substantially supports the ALJ's finding. As the ALJ observed in his opinion, Plaintiff is at least able to handle some changes in her environment, as reflected by her description of her daily activities, which consist of shopping on a weekly basis, visiting her son, gardening, or going to the library, counseling, and the post office. (Tr. 19, 185).

Importantly, it was the ALJ's responsibility to analyze the evidence and determine Plaintiff's RFC. While "physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578, (6th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(e)(1)). Here, the ALJ appropriately exercised his discretion to weigh the evidence, and substantial evidence supports his determination that Sinegar could perform jobs that involve only few changes in the workplace.

   D.  **Vocational data and cross examination of the VE**

Finally, Sinegar contends that the ALJ's decision at step five was erroneous for a number of related reasons. Primarily, Sinegar purports that the ALJ violated the agency's rules and her right to procedural due process by denying her request for the data underlying the VE's testimony and by unreasonably limiting counsel's cross examination at the hearing.

Having determined that remand is necessary due to the ALJ's insufficient analysis regarding the consultative examiner, the Court need not consider Sinegar's arguments regarding the VE's testimony. *See* Gunther v. Comm'r of Soc. Sec., 1:12-CV-0418, 2012 WL 6630906 (N.D. Ohio Nov. 28, 2012) *report and recommendation adopted*, 1:12-CV-418, 2012 WL 6630802 (N.D. Ohio Dec. 19, 2012).

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly, the Court VACATES the decision of the Commissioner and REMANDS the case to the Social Security Administration.

   IT IS SO ORDERED.

                                       s/ Kenneth S. McHargh
                                       Kenneth S. McHargh
                                       United States Magistrate Judge

   Date:  March 5, 2014.